# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

THERMO FISHER SCIENTIFIC  )
PSG CORPORATION,  )
   )
    Plaintiff and Counterclaim  )
    Defendant,  )
   )
    v.  )    C.A. No. 2022-0608-NAC
   )
ARRANTA BIO MA, LLC,  )
   )
    Defendant and Counterclaim  )
    Plaintiff.  )

## MEMORANDUM OPINION

Date Submitted:  February 10, 2023
Date Decided:  April 4, 2023

Philip Trainer, Jr., Marie M. Degnan, ASHBY & GEDDES, Wilmington, Delaware; Michael Klisch, Joshua Siegel, Georgina Inglis, COOLEY LLP, Washington, DC; Robert Cahill, David A. Vogel, COOLEY LLP, Reston, VA; *Counsel for Plaintiff and Counterclaim Defendant Thermo Fisher Scientific PSG Corporation*.

Michael A. Barlow, ABRAMS & BAYLISS, LLP, Wilmington, Delaware; John B. Quinn, Jennifer J. Barrett, Rachel E. Epstein, Evan Hess, Michael Linneman, Neil T. Phillips, Phillip B. Jobe, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York; *Counsel for Defendant and Counterclaim Plaintiff Arranta Bio MA, LLC*.

**COOK, V.C.**

This is the first chapter in a dispute among leading contract development and manufacturing organizations ("CDMOs") that provide pharmaceutical and biopharmaceutical services. At issue in this case is an agreement to develop plasmids. A plasmid is a small circular DNA molecule found in bacterial cells. Plasmids have at least one gene, such as genes associated with antibiotic resistance or that provide genetic advantages to the host organism, that can be passed from one cell to another. Because plasmids can be used as tools to clone, transfer, and manipulate genes in ways that are beneficial to humans, they are a central component to a growing number of next generation therapies and vaccines. Plasmids are a subset of a broader category of drugs referred to as biologics, which are drugs generally produced using living cells or organisms. This is in contrast to conventional drugs, which are chemically synthesized and are sometimes referred to as small-molecule drugs.

While the use of plasmids in drug development is growing rapidly, producing plasmids that are compliant with Food and Drug Administration regulations is very difficult and expensive. To develop and manufacture plasmids, a developer typically starts with a bank of genetically engineered cells that are often proprietary. The developer then must develop the specific processes to derive the plasmid from those cells and to manufacture those plasmids on a commercially viable scale.

CDMOs provide products and services related to the development and manufacturing of drugs. Thermo Fisher Scientific PSG Corporation ("PSG") and Recipharm AB ("Recipharm") are two of the largest CDMOs in the world. Arranta Bio MA, LLC ("Arranta") is also a CDMO and specializes in developing and manufacturing complex biological drugs and advanced therapeutic medicinal products.

In 2020, PSG and Arranta entered into an agreement under which Arranta would manufacture plasmids for PSG. Because the manufacture of plasmids involved the transfer of certain proprietary knowledge from PSG to Arranta, PSG sought to restrict Arranta from transferring its plasmid development operations to or being acquired by certain third parties. In such an event, the parties agreed that PSG would obtain the right to prevent Arranta from engaging in plasmid development and manufacturing services for 36 months (the "Non-Compete Obligation"), among other rights. One of the conditions to PSG's right to trigger the Non-Compete Obligation was that the counterparty to a transfer of the plasmid operations be a third-party that derived at least 50% of its revenue from performing contract "biopharmaceutical" development or commercial manufacturing services.

In April 2022, Arranta's grandparent entity was acquired by a wholly owned subsidiary of Recipharm. It is undisputed that while Recipharm derived almost all its revenue from performing CDMO services for small-molecule drugs, it derived

2

almost no revenue from such services for biologics. Shortly after the acquisition, PSG sued Arranta in this Court seeking to enforce the Non-Compete Obligation.

The central issue in the parties' dispute is whether "biopharmaceutical" means only biologics or if it encompasses both biologics and small-molecule drugs. I conclude that "biopharmaceutical" unambiguously means *only* biologics. Thus, even assuming that Recipharm was the counterparty in the acquisition of Arranta's grandparent (a point Arranta contests), PSG had no right to trigger the Non-Compete Obligation because Recipharm did not derive at least 50% of its revenue from services associated with biologics.

## I. FACTUAL BACKGROUND[1]

### A. Parties

Arranta is a Delaware limited liability company.[2] Arranta is a CDMO specializing in live biotherapeutic and mRNA products.[3] Mark Bamforth founded Arranta in 2019.[4]

---

[1] Joint trial exhibits are cited as "JTX ___," trial testimony is cited as "TT___ (Name)," and depositions are cited as "[Name] Dep. ___."

[2] *Thermo Fisher Scientific PSG Corp. v. Arranta Bio MA, LLC*, C.A. No. 2022-0608-NAC, Docket ("Dkt.") 180, Pretrial Stipulation and Proposed Order for Dec. 15–16, 2022 Trial ("Pretrial Stipulation") ¶ 20.

[3] JTX 208 ("Supply Agreement"), Recitals; JTX 314 at 3; *see also* TT135:9–138:9 (Bamforth).

[4] TT135:9–138:1 (Bamforth).

PSG is a Delaware corporation.[5] PSG described itself in the Supply Agreement as "a leading large and small molecule viral vector [CDMO]."[6] PSG is a part of Thermo Fisher Scientific Inc. ("Thermo").[7]

## B. Thermo's Investments In Bamforth's Companies

Before founding Arranta, Bamforth founded two other companies: Gallus Pharmaceuticals, LLC and Brammer Bio.[8] Gallus was merged into Patheon, Inc., which eventually became part of Thermo in 2017. Brammer Bio was acquired directly by Thermo in 2019 for $1.7 billion.[9]

Thermo was also an investor in Arranta Bio Holdings LLC ("Arranta Holdings"), which is Arranta's indirect grandparent company.[10] Prior to the merger at issue, Thermo was the third largest investor in Arranta Holdings.[11] Michel Lagarde, who was President of PSG at the time of Thermo's investment and is now Thermo's Chief Operating Officer, spearheaded Thermo's investment in Arranta

---

[5] Pretrial Stipulation ¶ 19.

[6] Supply Agreement, Recitals.

[7] *Id.*

[8] TT130:12–22; TT133:5–11 (Bamforth).

[9] JTX 74 at 1; Lagarde Dep. 98:17–101:24; TT134:6–17 (Bamforth).

[10] JTX 247, Sch. A.

[11] *Id.*; TT141:16–142:6 (Bamforth).

Holdings.[12]  Lagarde also led Thermo's acquisitions of Gallus and Brammer Bio.[13]

Lagarde understood that Bamforth's general business model was to develop new ventures using private equity seed money and then sell or transfer the company to monetize the investment.[14]

### C.     Supply Agreement[15]

Shortly after Thermo invested in Arranta Holdings, PSG and Arranta began negotiating an agreement whereby Arranta would develop and manufacture commercial-grade plasmids at Arranta's Watertown, Massachusetts facility (the "Watertown Facility").[16]  Plasmids are sometimes a component used to develop large-molecule drugs derived from living organisms (sometimes referred to as "biologics").[17]  Biologics are distinguished from traditional, small-molecule drugs

---

[12] Lagarde Dep. 14:7–19, 96:9–103:4; TT142:7–143:21 (Bamforth).

[13] Lagarde Dep. 96:9–103:4.

[14] Lagarde Dep. 104:2–14.

[15] As excerpted below, Sections 16.2.2 and 18.4 both contain capitalized terms that are defined elsewhere in the Supply Agreement.  Except for the term "PSG Competitor," the definitions of these capitalized terms are not relevant to this decision.

[16] *See* JTX 112 at 2, § 1.77 ("PSG desires to engage Arranta to [manufacture] and supply Product," which is defined as "plasmid DNA [manufactured] using E coli fermentation production method[.]").

[17] TT535:6–9 (Turck); TT651:17–24 (Lankau).  This Memorandum Opinion interchangeably uses the terms "biologics," "large molecules," "large molecule drugs," and "large-molecule biologics."  While there may be particular distinctions between these terms in the relevant industry, these terms mean the same thing for the purpose of this Memorandum Opinion.

derived from chemical synthesis (*e.g.*, aspirin).[18] The core purpose of the Supply Agreement was that Arranta would design and build out the Watertown Facility to develop and manufacture plasmids exclusively for PSG for an anticipated nine-year term, and potentially longer.[19]

In December 2019, PSG and Arranta signed a non-binding letter of intent, which formed the basis for the Supply Agreement.[20] PSG drafted the first version of the Supply Agreement, which Jesse Boyd sent to Arranta in January 2020.[21] Boyd was the lead negotiator for PSG in connection with the Supply Agreement.[22] At the time of the parties' negotiations, Boyd was in a business management and finance role at PSG.[23] He left PSG in April 2022 to become vice president of finance for cell, gene, and protein therapies at Catalent Pharma Services.[24] In negotiating the

---

[18] TT535:2–5 (Turck); TT652:5–10 (Lankau). This Memorandum Opinion interchangeably uses the terms "small molecules," "small-molecule drugs," "pharmaceuticals," and "small-molecule pharmaceuticals." While there may be particular distinctions between these terms in the relevant industry, these terms mean the same thing for the purpose of this Memorandum Opinion.

[19] *See* Recitals to Supply Agreement; *see also* Supply Agreement § 16.1 ("This Agreement will remain in effect for nine (9) years from January 1, 2021 ('Initial Term') and will automatically renew for additional three (3) year periods[.]").

[20] TT174:1–10 (Bamforth); JTX 102.

[21] JTX 112; *see also* JTX 391 (Nos. 19–21) (PSG admitting in interrogatories that it drafted the first version of the Supply Agreement).

[22] TT11:2–7 (Boyd).

[23] TT8:15–20 (Boyd).

[24] TT7:8–16 (Boyd).

Supply Agreement, Boyd was assisted by two in-house attorneys, Meenu Patel and Redi Kasollja, and a commercial person with a science background, Darren Leva.[25]

Bamforth, Steve Favaloro, and Lana Gladstein, were the primary negotiators for Arranta in connection with the Supply Agreement.[26] Favaloro was Arranta's chief financial officer at the time of the negotiations and was responsible for "assessing the different opportunities" and "looking at the financial value."[27] Gladstein was the chief legal officer of Arranta at the time and was primarily responsible for offering legal advice on the agreement.[28]

The final version of the Supply Agreement was executed on June 29, 2020, approximately five months after the first draft was sent by PSG to Arranta.[29] Over the course of those five months, the parties exchanged at least nine drafts, reflecting the parties' substantial negotiations of the terms of the Supply Agreement.[30] In addition to exchanging drafts, the parties had significant in-person and virtual

---

[25] TT11:2–18 (Boyd).

[26] TT145:9–146:5 (Bamforth).

[27] *Id.*

[28] *Id.*

[29] Supply Agreement at 1.

[30] JTX 110 (draft of January 27, 2020); JTX 133 (draft of April 10, 2020); JTX 159 (draft of May 22, 2020); JTX 167 (draft of June 7, 2020); JTX 188 (draft of June 18, 2020); JTX 191 (draft of June 19, 2020); JTX 195 (draft of June 19, 2020); JTX 197 (draft of June 21, 2020); JTX 199 (draft of June 22, 2020).

discussions.[31]  The drafts reflect that the parties extensively negotiated Sections 16.2.2 and 18.4, which address the parties' exit and assignment rights and obligations.  Quite notably, the drafts further reflect the absence of significant negotiation over the definition of PSG Competitor in Section 1.106.

## 1. Sections 16.2.2 And 18.4

Both PSG and Arranta agree that Arranta's termination rights were of central importance in the negotiations.  There are two provisions that deal with these termination rights: Section 16.2.2, which is labeled "Termination for Convenience by Arranta," and Section 18.4, which is labeled "Assignment."  Section 16.2.2 of the Supply Agreement provides as follows:

> 16.2.2.  <u>Termination for Convenience by Arranta</u>.  Arranta may terminate the Agreement for any reason or no reason at all beginning no earlier than three (3) years from the date that the Dedicated Space has been Commissioned and Qualified upon giving prior written notice to PSG.  The termination shall become effective at the earlier of eighteen (18) months from the date of the notice or such longer period of time that may be mutually agreed between the Parties.  As part of such termination:
>
> (i)  Arranta shall continue to perform Services in accordance with this Agreement until the termination becomes effective and shall ensure that there will be no interruption to the Manufacture and supply of Product in accordance with the Agreement during that time.
>
> (ii)  at Arranta's sole expense and cost, Arranta shall provide Outgoing Technology Transfer as provided in Section 16.3.3, unless PSG is being supplied with Product from an Affiliate or a

---

[31] TT29:10–30:18 (Boyd); TT154:2–155:2 (Bamforth).

8

Third Party independent of Arranta, before the date of Arranta's notice of termination pursuant to this Section 16.2.2.

(iii) at Arranta's sole expense and cost, Arranta shall remove and transfer all portable Capital Equipment (listed in Exhibit C as of the Effective Date) and Bespoke Equipment (if any) to another facility for plasmid manufacturing in accordance with PSG's reasonable written instructions;

(iv) Arranta shall (a) issue to PSG as a credit against the Royalty the remainder (calculated from the effective date of termination under this Section 16.2.2 through the end of the Term) of the following payments made by PSG for the Term: (x) the remaining Capacity Access Fee plus Risk-Free Interest and (y) the Advanced Deposit; and (b) refund to PSG within thirty (30) days of the effective date of termination under this Section any amount set forth in subsections (a)(x) and (a)(y) in excess of the Royalty that cannot be applied against the Royalty;

(v) PSG shall have the option, at its sole election, to acquire portable Capital Equipment (which is listed in Exhibit C as of the Effective Date or added subsequently) with a net book value of up to two million US Dollars ($2,000,000) as of the effective date of termination under this Section 16.2.2 for no charge and to purchase any additional Capital Equipment at net book value; and

(vi) PSG shall be relieved of the obligation (if any) to maintain Established Capacity Utilization or make Minimum Payment pursuant to Section 4.2.4 as of the date of Arranta's notice of termination pursuant to this Section 16.2.2 and through the remainder of the Term.

In the event Arranta exercises its right to terminate the Agreement pursuant to this Section 16.2.2[], Arranta agrees that it shall not engage in plasmid development and manufacturing services for a period of thirty-six (36) months from the date of its notice of termination under this Section 16.2.2 (the "Non-Compete Obligation"). For the avoidance of doubt, the Non-Compete Obligation shall only apply to Arranta and shall not apply to any acquiror,

transferee or a successor in connection with a Change in Control Transaction.[32]

In layman's terms, Section 16.2.2 imposes various obligations on Arranta if it terminates the Supply Agreement for convenience, including obligations concerning (a) continued performance under the Supply Agreement following a notification of intent to terminate, (b) the return of certain equipment to PSG, and (c) Arranta's commitment not to engage in plasmid development and manufacturing services for thirty-six months (*i.e.*, the Non-Compete Obligation).

Section 18.4 of the Supply Agreement is a complex provision that provides as follows:

> 18.4. <u>Assignment</u>. Neither this Agreement, any Work Statement or Product Addendum, nor any of either Party's rights or obligations hereunder, may be assigned, novated or otherwise transferred by either Party without the prior written consent of the other Party, except that either Party may assign this Agreement or its rights or obligations hereunder without the other Party's consent (a) to an Affiliate (provided that such Affiliate will assume all obligations of its assignor under this Agreement including accrued obligations of the assignor); or (b) to an acquiror, transferee or a successor in connection with a merger, reorganization, consolidation, business combination or sale, or other transfer to a Third Party (a "<u>Change of Control Transaction</u>") of all or substantially all of the assets or business to which this Agreement relates (the "<u>Plasmid Operations</u>"), by providing at least thirty (30) days advance written notice to the other Party. In the event that (i) Arranta has not exercised its right to terminate for convenience pursuant to Section 16.2.2 or the Parties have not agreed to relocate the Plasmid Operations at another Facility as set forth in Section 4.6.1, and (ii) the counterparty in the Change of Control Transaction is a PSG Competitor, then, at PSG's election; (1) a notice of termination by Arranta under Section 16.2.2 shall be deemed to have been

---

[32] Supply Agreement § 16.2.2. I refer to the termination under this section as a "Termination for Convenience."

issued and the Agreement will be terminated pursuant to Section 16.2.2: or (2) Arranta, its Affiliate, or their respective successors or assigns, as applicable, shall (x) continue to perform Services in accordance with the Agreement for the remainder of the Term and (y) implement commercially reasonable and appropriate physical and informational barriers so as to prevent the dissemination of information related to this Agreement and the Services to any Person not directly involved in the performance of Services.[33]

In short, the first sentence of Section 18.4 generally prohibits either Arranta or PSG from assigning the Supply Agreement but sets forth two exceptions: an assignment to an affiliate or in connection with a Change of Control Transaction. The second sentence of Section 18.4 provides that if the counterparty in the Arranta Change of Control Transaction is a PSG Competitor, then, subject to certain conditions, PSG may elect to deem that Arranta provided notice of its intent to terminate the Supply Agreement for convenience pursuant to Section 16.2.2.

### 2. PSG Competitor

Both in the initial draft and final version of the Supply Agreement, PSG Competitor is defined as a business that "derives at least fifty percent (50%) of its revenues from performing contract biopharmaceutical development or commercial manufacturing services."[34] Indeed, over the five months of negotiations concerning

---

[33] Supply Agreement § 18.4.

[34] Supply Agreement § 1.106. "Third Party" is defined in the Supply Agreement as "a Person who is neither a Party nor an Affiliate of a Party." *Id.* § 1.128. "Person" is defined in the Supply Agreement as "an individual, partnership, corporation, limited liability company, joint stock company, unincorporated organization or association, trust or joint venture, or a governmental agency or political subdivision thereof." *Id.* § 1.94. "Party" is defined in the Supply Agreement as PSG and Arranta. *Id.*, Preamble. "Affiliate" is defined

the Supply Agreement, the only change to the definition of PSG Competitor was the insertion of a reference to "Third Party," which Kasollja testified did not change its meaning.[35] The term PSG Competitor is used only once in the Supply Agreement, in Section 18.4. As described above, pursuant to Section 18.4, if the counterparty to a Change of Control Transaction is a PSG Competitor, then PSG has certain rights.[36]

Kasollja, the PSG in-house attorney who was primarily responsible for drafting the Supply Agreement, did not recall using any particular template in preparing the first draft of the Supply Agreement.[37] Generally, however, PSG often relies on a contract template when negotiating affiliate contracts similar to the Supply Agreement.[38] Arranta introduced twenty-five publicly available affiliate contracts since 2012 that include the term "Patheon Competitor." Eight of the

---

in the Supply Agreement as, "with respect to an entity, a separate person, corporation, partnership or other business entity that directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with such first entity. For the purposes of this definition, the word "control" (including, with the correlative meaning, the terms "controlled by" or "under the common control with") shall mean the actual power to direct or cause the direction of the general management and policies or activities of such entity, whether through (a) the ownership of at least fifty percent (50%) of voting securities or capital stock of such business entity or any other comparable equity or ownership interest with respect to a business entity other than a corporation, (b) contract or (c) any other basis of control." *Id.* § 1.4.

[35] TT151:2–14 (Bamforth); TT443:4–19 (Gladstein); Kasollja Dep. 51:21-52:3, 59:12-60:20.

[36] *Id.* § 18.4.

[37] Kasollja Dep. 99:15–100:14.

[38] Conner Dep. 34:11–36:6. The issue of what particular template may have been used to prepare the original draft of the Supply Agreement was not developed at trial.

examples define the term using the phrase "pharmaceutical and biopharmaceutical."[39] The remainder use just "pharmaceutical" standing alone.[40] PSG attributes the varying definitions of the term "Patheon Competitor" (or, in this case, PSG Competitor) to the different business relationships to which each contract related.[41]

Both Boyd and Kasollja testified that they understood PSG Competitor to capture any CDMO and was not limited to those involved primarily in biologics.[42] During the negotiations of the Supply Agreement, however, PSG's negotiators never expressly told Arranta's negotiators that PSG purportedly viewed the word "biopharmaceutical" within the term PSG Competitor as encompassing both small-molecule drugs and biologics.[43]

---

[39] JTX 61; JTX 76; JTX 77; JTX 78; JTX 87; JTX 155; JTX 252; JTX 457.

[40] JTX 17; JTX 21; JTX 23; JTX 28; JTX 30; JTX 35; JTX 37; JTX 40; JTX 42; JTX 44; JTX 46; JTX 54; JTX 56; JTX 59; JTX 63; JTX 70; JTX 368.

[41] Dkt. 232 ("Pl.'s Post-Trial AB") at 29 ("[T]he contracts are not 'similar' because, unlike the Supply Agreement, [PSG] was a service provider (not the customer) in those agreements. . . . [PSG] must capture all ways in which [PSG] customers with mixed portfolios define themselves, *i.e.*, as biopharmaceutical companies (like Pfizer) or pharmaceutical companies (like Roche).").

[42] TT28:21–29:4 (Boyd); Kasollja Dep. 17:17–18:13.

[43] TT30:19–31:4 (Boyd) ("Q: At any time during the negotiation of the supply agreement, did you ever have a discussion with anyone at Arranta about the meaning of the term 'biopharmaceutical'? A: No. Q: And to your knowledge, during the negotiations, did anyone at PSG ever have a discussion with anyone at Arranta about the meaning of the term 'biopharmaceutical?' A: Not to my knowledge.").

At trial, Bamforth recalled telling PSG's negotiators that biopharmaceutical meant biologics only.[44] Boyd, however, testified at trial that no one at Arranta told PSG that it viewed PSG Competitor as applying only to companies with at least 50 percent of revenues from biologics only.[45] In addition, during his deposition, Bamforth stated that he could not recall whether he expressed his view that "biopharmaceutical" meant biologics only.[46] Arranta was also unable to point to contemporaneous documents or communications from these negotiations indicating that "biopharmaceutical" meant biologics only. Given Bamforth's inconsistent testimony on this point and the absence of any contemporaneous documents, I ultimately find that neither party explicitly stated their view of the meaning of "biopharmaceutical" during negotiation of the Supply Agreement.

In April 2020, however, while the parties were still negotiating the Supply Agreement, Boyd told Arranta's negotiators that examples of a PSG Competitor would be "Catalent" or "Lonza."[47] Bamforth and Favaloro also documented this discussion in contemporaneous notes. For example, Bamforth's notes of his April

---

[44] TT153:8–23 (Bamforth) ("Q: And did you communicate to Jesse Boyd and potentially the rest of the team your understanding that the word 'biopharmaceutical' means biologics only? A: Yes.").

[45] TT31:5–13 (Boyd).

[46] Bamforth Dep. 46:18–53:12.

[47] TT154:2–12 (Bamforth) ("Q: And what were the examples [of a PSG Competitor] that Mr. Boyd provided? A: He gave two examples. One was Lonza and one was Catalent.").

14

10, 2020, negotiations with Boyd referred to Section 18.4 of the draft and say, "Cannot have sale to Competitor (CDMO)."[48]  In addition, in an internal May 12, 2020, email, Favaloro wrote that "[PSG] clarified that the basis of the push on assignability is to ensure the protection of [PSG] clients in the instance a Catalent or Lonza were to acquire the business."[49]

"Lonza" referred to Lonza Group AG, a large multinational CDMO.[50] Biologics accounted for 56% of Lonza's total revenue in 2019, and 58% of Lonza's total revenue in 2020.[51]  "Catalent" referred to Catalent, Inc., another large multinational CDMO.[52]  Biologics accounted for 23% of Catalent's total revenue in 2019,[53] and 33% of Catalent's total revenue in 2020.[54]  While Catalent's revenue from biologics was below 50% at the time of the parties' negotiations, Catalent had been aggressively expanding its footprint in the biologics CDMO sector through multiple acquisitions.[55]  As Catalent stated in its 2020 annual report, "[i]n large part

---

[48] JTX 399 at 70.

[49] JTX 153 at 1.

[50] JTX 233.

[51] JTX 249 at 108; JTX 233 at 92.

[52] JTX 213 at 6–7.

[53] JTX 80 at 53.

[54] JTX 213 at 50.

[55] See id. at 7 (describing numerous acquisitions in the biologics CDMO sector from 2017 to 2020).  TT59:22–66:13 (Boyd) (setting forth the timeline of Catalent's acquisitions and organic growth in the biologics space between 2017 and 2020).

due to our recent acquisitions and their subsequent organic growth, revenue contributions from our biologics business have grown from approximately 10% in fiscal 2014 to 33% in fiscal 2020."[56] By June 30, 2022, Catalent derived more than 50% of its revenue from biologics.[57]

Bamforth had familiarity with both Lonza and Catalent when Boyd offered the two companies as examples of a PSG Competitor.[58] Concerning Lonza, Bamforth testified that during the negotiation of the Supply Agreement he was aware that it was one of the largest CDMOs in the industry, with the majority of its products being biologics.[59] Concerning Catalent, Bamforth testified that during the negotiation of the Supply Agreement he was aware that Catalent had been making multiple acquisitions in the biologics sector.[60] Both Bamforth and Boyd acknowledged that they did not look at the revenues of either Lonza or Catalent to determine whether either met the definition of PSG Competitor.[61] Bamforth

---

[56] *Id.*

[57] JTX 378 at 7.

[58] TT155:3–160:18 (Bamforth).

[59] TT155:3–22 (Bamforth). Bamforth stated that his familiarity with Lonza at the time of negotiation was because he had been in competition with Lonza in his prior two businesses and because it was one of the largest CDMOs in his industry. TT155:18–22 (Bamforth).

[60] TT156:8–160:18 (Bamforth). Bamforth attributed his familiarity with Catalent at the time of negotiation to certain conversations with Catalent's CEO and his general familiarity with the biopharmaceutical industry. *Id.*

[61] TT58:20–59:4 (Boyd); TT155:3–160:1 (Bamforth).

16

provided the following reason for not doing so: "I didn't feel this was something where we were trying to be precise. Plus, it was also a condition related to a future transaction of Arranta, not a present day check."[62]

### D. Arranta's Potential Sale To AMRI

The relationship between Arranta and PSG was strained almost from the beginning. In August 2020, shortly after the parties signed the Supply Agreement, PSG contracted with a vaccine maker to develop a plasmid-based COVID-19 vaccine.[63] PSG asked Arranta to perform a "study" to determine whether Arranta could develop plasmids for the vaccine, and Arranta confirmed it was able to do so.[64] In response, PSG proposed that Arranta produce a significantly higher volume of plasmids at a significantly lower royalty rate.[65] Arranta attempted to negotiate for a higher royalty rate but was rebuffed by PSG, which decided to pursue alternative options.[66]

---

[62] TT156:4–7 (Bamforth).

[63] TT73:5–24 (Boyd); TT413:11–21 (Wyszkowski); TT188:4–8 (Bamforth).

[64] TT183:20–184:9 (Bamforth).

[65] TT184:16–185:11 (Bamforth) ("Q: Do you recall what the delta was, what the actual royalty rates would be under [the proposed amendment to the Supply Agreement]? A: Yes, it would drop the royalty rate from 27.5% in our contract to the equivalent of about 6% at full output for that demand.").

[66] TT185:12–187:21 (Bamforth).

Bamforth stated that Arranta was "feeling a little bruised" from PSG's attempts to renegotiate the Supply Agreement and began considering exit options.[67] Beginning in September 2020, the Arranta team looked into various strategic options for the Watertown Facility, including a potential sale.[68] Arranta considered three options: continue to operate the facility, limit the use of the facility to manufacturing COVID-19 vaccines, or pursue a sale of the facility. In connection with the last option, the Arranta team discussed internally the implications of the PSG Competitor definition in the Supply Agreement.[69] In addition, in a slide deck apparently prepared by Favaloro, a bullet point was included stating that Arranta would "[i]deally . . . avoid sale to any CDMO to avoid 'PSG Competitor' entanglement on sale."[70]

Arranta engaged Morgan Stanley to assist with preparing a list of potential buyers.[71] The list prepared by Arranta and Morgan Stanley categorized potential

---

[67] TT187:22–189:3 (Bamforth).

[68] TT188:9–189:3 (Bamforth); JTX 216.

[69] *See* JTX 215 at 2 (email from Favaloro to Shailesh Maingi stating that "we can't sell to another CDMO due to the restrictions in the plasmid contract – we are prevented from selling to a 'PSG Competitor'"); *id.* (response from Maingi to Favaloro stating "I spoke to Mark [Bamforth] yesterday about this [and] we can't sell to someone who has >50% of revenue from biopharmaceutical development/manufacturing . . . but we can sell to an organization other than that"); *id.* at 1 (Favaloro stating "Shailesh agree there is some nuance to it…we can look at the language together tomorrow and I can share the legal opinions we've gotten on it").

[70] JTX 216 at 11.

[71] TT189:23–190:16 (Bamforth).

buyers by type ("CDMO/Other," "Financial," or "Product Company").[72] The list also included a column identifying whether a potential buyer might be a PSG Competitor based on "the collective knowledge of the team . . . who were very familiar with many of these companies."[73] In addition, the list contained a column titled "Fit," which included certain comments as to potential issues with a transaction with the relevant buyer.[74]

Consistent with the Supply Agreement negotiations, both Lonza and Catalent were identified as PSG Competitors.[75] Albany Molecular Research Inc. ("AMRI") was included on this list and identified as not a PSG Competitor.[76] In the "Fit" column for AMRI, the following comment was included: "Confirm biomanufacturing less than 50%."[77] Recipharm was also included on this list and identified as not a PSG Competitor.[78] Both AMRI and Recipharm were listed as "CDMO/Other" in the "Buyer Type" column.[79]

---

[72] JTX 219.

[73] *Id.*; TT190:17–192:18 (Bamforth).

[74] JTX 219.

[75] *Id.*

[76] *Id.* AMRI has since changed its name to Curia. This decision refers to the company as AMRI for sake of consistency.

[77] *Id.*

[78] *Id.*

[79] *Id.*

On October 27, 2020, Bamforth spoke to Lagarde to discuss a potential sale of the Watertown Facility.[80] Soon thereafter, AMRI made a non-binding offer to acquire the Watertown Facility.[81] On December 16, 2020, Arranta notified PSG that AMRI was a potential buyer of the Watertown Facility.[82] Both Arranta and PSG were aware that AMRI did not derive more than 50% of its revenues from biologics.[83]

In disclosing AMRI as a potential buyer in December 2020, Bamforth testified that his contemporaneous notes reflect that he informed Shafer that AMRI was "not a PSG [C]ompetitor because they had very little activity in biopharmaceuticals."[84] Shafer, however, testified that he did not recall Bamforth ever telling him that AMRI was not a PSG Competitor.[85] And, on cross-examination, Bamforth modified his testimony to say that he could not be certain that he in fact told Shafer that AMRI was not a PSG Competitor.[86]

---

[80] TT199:2–7 (Bamforth); JTX 399 at 12.

[81] TT202:22–203:15 (Bamforth).

[82] *Id.*; TT82:6–83:8 (Shafer); JTX 399 at 8.

[83] *See* TT84:12–16 (Shafer) ("Q: Did you know at the time whether it derived any of its revenues from biologics?  A: My impression was at the time that it was more small molecule, but I didn't know specifics on it.").

[84] TT203:21–204:9 (Bamforth); JTX 399 at 8.

[85] TT85:12–23 (Shafer).

[86] TT257:11–21 (Bamforth) ("Q: Do you swear under oath that you told Mr. Shafer that when you talked about AMRI that you believed it was not a PSG competitor?  A: So this was a very important point to us, and we knew it was a very important point to PSG.  My

Bamforth set up a call between Shafer and a representative of AMRI to discuss a potential partnership between PSG and AMRI following an acquisition of the Watertown Facility.[87] During that call, Shafer told AMRI that "it would be kind of awkward to partner with a competitor, a CDMO competitor, but I would be open to the discussion."[88] AMRI did not take the call with Shafer well. Afterwards, a representative of AMRI reached out to one of Arranta's executives and informed him of Shafer's comments.[89] AMRI subsequently decided not to pursue an acquisition of the Watertown Facility.[90]

PSG never explicitly told Arranta that it viewed AMRI as a PSG Competitor under the Supply Agreement, either before or after Shafer's call with AMRI.[91] Indeed, Shafer testified that at the time of his discussion with AMRI he "wasn't

---

notes, where I had notes, I take those at face value, but I didn't try to write everything down. So I believe I told him, but I cannot swear to you that there is no doubt that I told him, but this was the essence of it.").

[87] TT82:22–86:18 (Shafer).

[88] TT83:15–21 (Shafer).

[89] TT211:10–212:9 (Bamforth).

[90] See JTX 2041 ("AMRI's view of [the call with Shafer] was that they were scared away and they decided not to bid. They felt there was ambiguity about [PSG's] intentions and did not see a desire from [PSG] to partner.").

[91] TT90:17–91:5 (Shafer).

aware of the details of the supply agreement" and did not know what the term PSG Competitor meant because he "didn't read the supply agreement."[92]

Similarly, no one at Arranta reached out to PSG after the call between AMRI and Shafer to convey the view that AMRI was not a PSG Competitor.[93]  Bamforth attributed this to the fact that he viewed the deal as already dead and did not see any reason to pursue the point since AMRI had already pulled out of the bidding process.[94]

### E.     Merger With Recipharm

In November 2021, approximately one year after Arranta's discussions with AMRI, Arranta Holdings received an unsolicited purchase offer from Recipharm, which "is a leading global pharmaceutical [CDMO]."[95]  The events that followed were a major subject of trial, due in particular to the insertion of equitable defenses into the scope of trial.

---

[92] TT90:9–91:5 (Shafer).  I note that, during trial, Shafer testified that he at least told Bamforth that AMRI was a "competitor."  TT86:2–18; 91:15–92:18 (Shafer).  There was some dispute during trial whether Shafer's testimony at trial on this point conflicted with his deposition testimony.  TT91:15–95:21 (Shafer).  Such disputes were not limited to Shafer.  Bamforth submitted not one, but two errata sheets before trial in this matter.  The second errata sheet adds the word "not" to a response, reversing the answer that appears on the deposition transcript to a question concerning whether PSG told Bamforth "at some point in time" that it believed AMRI was a PSG Competitor.  *See* Pl.'s Post-Trial OB at 20 (citing Bamforth Dep. 161:14-22); TT212:17-214:12 (Bamforth).

[93] TT258:22–259:1 (Bamforth).

[94] TT259:2–22 (Bamforth).

[95] TT226:3–227:3 (Bamforth); JTX 262 at 4.

### 1. Arranta Holdings Notifies Thermo Of Purchase Offer

On December 13, 2021, Arranta Holdings provided Thermo with a "Transaction Notice" informing Thermo that Arranta Holdings had received a bona fide offer to buy the company.[96] This notice was provided to Thermo because it was an investor in Arranta Holdings.[97] Arranta Holdings did not disclose that Recipharm was the offeror.[98] The notice did state that "Arranta [Holdings] can confirm that the offeror is not a PSG Competitor as defined in the [Supply Agreement]."[99] Pursuant to Section 7.6(b) of the Arranta Holding's LLC agreement, Thermo had the right to make an offer to acquire Arranta Holdings within 45 days after receipt of the notice, and Arranta Holdings was required under the LLC agreement to consider the offer in good faith.[100] Thermo did not make any offer to acquire Arranta Holdings during that period.

Bamforth called Shafer the same day that Arranta Holdings sent the "Transaction Notice" to Thermo.[101] During that call, Shafer stated that Thermo "would need to think carefully about whether or not to make an offer to buy the

---

[96] JTX 263 at 2.

[97] JTX 247 § 7.6.

[98] TT235:1–12 (Bamforth).

[99] JTX 263 at 2.

[100] *Id.*

[101] TT236:13–19 (Bamforth).

company" because Thermo "had not budgeted the potential acquisition of Arranta[.]"[102] Bamforth informed Shafer that the buyer was a CDMO and "emphasized to [Shafer] that . . . we were deliberate in avoiding the PSG Competitor in thinking about whether to move ahead with this or not."[103] Shafer did not reference the PSG Competitor term or express concern that the potential buyer was a CDMO.[104] Nonetheless, he began to "prep to divest" from Arranta Holdings two days later.[105]

### 2. The Arranta/PSG Relationship Deteriorates

On January 13, 2022, Thermo's designated Arranta Holdings board observer and Vice President of Strategy, Lorraine Mercurio, requested "identification of the offeror" to assist Thermo in its "decision-making process" for an offer.[106] Separately, four days later, PSG sent Arranta a letter requesting a "for cause" audit of Arranta based on certain alleged defects with products produced by Arranta.[107]

---

[102] TT236:20–237:1 (Bamforth).

[103] TT237:9–238:7 (Bamforth).

[104] TT237:9–238:14 (Bamforth) ("Q: When you told him it was a CDMO, did Mr. Shafer say that PSG believed any CDMO would be a PSG Competitor under the Supply Agreement? A: No. Q: Did he say anything at all about the offeror potentially being a PSG Competitor? A: No.").

[105] JTX 266 at 120.

[106] JTX 277.

[107] JTX 396. PSG's Complaint included claims that Arranta breached the Supply Agreement based on the alleged product quality issues that in part formed the basis for PSG's "for cause" audit. Dkt. 1 ("Compl.") ¶¶ 69–73, 87–98. These issues will be the subject of a follow-on trial in this matter, which is currently scheduled for September 2023.

Lawrence Pitcher, the head of PSG's plasmid operations, was the individual that recommended that PSG initiate a "for cause" audit, and Leon Wyszkowski, Pitcher's boss, approved the recommendation.[108] At the time he emailed Wyszkowski recommending a "for cause" audit, Pitcher was not aware of the potential acquisition of Arranta Holdings.[109] Wyszkowski, who approved sending the letter, was aware of the potential acquisition.[110]

Arranta Holdings viewed Mercurio's request and the "for cause" audit letter as a concerted effort by PSG to try to disrupt the sale to Recipharm.[111] In response to Mercurio's letter, Bamforth sent her a letter, which was drafted by Gladstein and the law firm Goodwin Procter.[112] The letter stated that the board of Arranta Holdings concluded that it had no obligation to, and elected not to, disclose the identity of the potential buyer to Thermo or Mercurio, in her capacity as a board observer.[113] In the letter, Bamforth insinuated that Mercurio may have breached her fiduciary duties

---

[108] JTX 1001 at 1; TT595:18–596:20 (Pitcher).

[109] TT600:18–601:3 (Pitcher).

[110] TT371:4–7 (Wyszkowski).

[111] TT238:18–239:10 (Bamforth).

[112] TT321:3–17 (Bamforth).

[113] JTX 281 at 1.

as a board observer by acting in the interests of Thermo rather than Arranta Holdings.[114]  The letter also took aim at Thermo:

> We also note that since [Arranta Holdings] delivered the Transaction Notice to Thermo Fisher on December 13, Thermo Fisher has engaged in a series of steps that are not in keeping with the collaborative relationship between Arranta [Holdings] and Thermo Fisher to date, and appear to be calculated to attempt to interfere with the Potential Transaction described in the Thermo Fisher Notice.  These include the purported "for cause" audit notice that Thermo Fisher sent on January 19, 2022, as well as Thermo Fisher's subsequent communication purporting to escalate the audit request to a Commercial Dispute[.]  Thermo Fisher should cease these attempts to interfere with the Potential Transaction.[115]

PSG and Arranta ultimately agreed to refer to the "for cause" audit as an "operational summit," which occurred in early February 2022.[116]

### 3.    Recipharm's Due Diligence Of Arranta Holdings

While Arranta Holdings and Thermo sparred over the potential acquisition, Arranta Holdings continued to move full speed toward signing and closing its transaction with Recipharm.  After receiving the offer, Arranta Holdings and Recipharm each conducted additional due diligence.  According to Recipharm's

---

[114] *Id.* at 2 ("[T]he Board notes that certain portions of the Observer Letter . . . appear to have been delivered on behalf of, or in the interests of, Thermo Fisher rather than by you, in your individual capacity as the Observer.  In light of the foregoing, the Board reminds you that, in your capacity as Observer, you have certain fiduciary and other duties to the Company pursuant to the express terms of the Operating Agreement, including a duty of loyalty.  The Board is confident that you will comply with those duties moving forward.").

[115] *Id.*

[116] TT602:7–20 (Pitcher).

2020 annual report, the company's revenues from biologics were "well under" 50%.[117] It is not disputed that, both prior to and after the merger, Recipharm derived nearly all its revenue from CDMO services and virtually none of that revenue was related to biologics.[118]

Arranta Holdings retained Goodwin Procter as legal counsel and Morgan Stanley as its financial adviser for purposes of the proposed transaction.[119] Gladstein was intimately involved in the due diligence process on Arranta's side and "the person in charge at Arranta" of providing information to Goodwin.[120] Recipharm retained Kirkland & Ellis as legal counsel and Centerview as its financial adviser.[121]

Among the action items included in the due diligence process, Kirkland requested information about the Supply Agreement negotiations.[122] In addition, a draft timeline of the merger prepared by Recipharm's advisers included as a gating item the receipt of a waiver from PSG of the Supply Agreement's change-of-control provisions.[123]

---

[117] TT227:13–21, 229:6–233:8 (Bamforth); JTX 262 at 6–7.

[118] Dkt. 220 ("Pl.'s Post-Trial OB") at 22–23.

[119] TT447:16–448:11 (Gladstein).

[120] TT501:20–24, TT509:17–23 (Gladstein).

[121] TT447:16–448:11 (Gladstein).

[122] JTX 291; TT449:23–450:23 (Gladstein).

[123] JTX 271 at 3.

In light of the prior experience with AMRI, Bamforth and other individuals at Arranta Holdings were concerned about any perception by Recipharm that it might be a PSG Competitor under the Supply Agreement. Indeed, Bamforth spoke directly with Recipharm's CEO and "told him that there would be consequences if we were to try to sell the company to somebody who is a PSG Competitor; and, therefore, it was important to establish that Recipharm would not fall into that category."[124] Upon reviewing the proposed merger timeline, Favaloro sent an email to Morgan Stanley and Bamforth that was more explicit in his concerns regarding PSG:

> [W]e've seen with [PSG's] behavior in [AMRI] that they are likely not going to play nice here. We need your help messaging that to Centerview and Reci—we must hammer home that it is our opinion Reci is not a PSG competitor and therefore they can take the contract over without waiver or consent.[125]

To allay any concerns held by Recipharm that it might be a PSG Competitor under the Supply Agreement, the executive team of Arranta Holdings took a two-prong approach. First, Bamforth informed Recipharm's CEO that the term "biopharmaceutical" in the PSG Competitor definition meant only biologics and did not encompass small molecule drugs.[126] Bamforth, however, did not apprise

---

[124] TT228:5–14 (Bamforth).

[125] JTX 272 at 1.

[126] TT228:16–229:5 (Bamforth) ("Q: How did you describe the definition [of PSG Competitor]? A: As more than 50 percent of their revenue coming from biopharmaceutical development or commercial supply. Q: And did you have an understanding as to why [Recipharm's CEO] believed Recipharm was clearly not a PSG [C]ompetitor? A: Yes,

Recipharm's CEO of the prior discussions with AMRI that fell apart following the discussion between Shafer and AMRI's representatives.[127] Bamforth also did not tell Recipharm's CEO that Boyd had used Catalent and Lonza as examples of a PSG Competitor.[128]

Second, Gladstein, Goodwin Procter, and Morgan Stanley addressed concerns raised by Kirkland and Centerview. Kirkland emailed the Arranta Holdings' team and advisers on January 31, 2022, asking "to see if you have been able to find any additional emails/info in your files on how the PSG Competitor definition was agreed at the time of negotiation the Thermo agreement."[129] After discussing internally, Goodwin Procter sent an email on February 2, 2022, based on information provided by Gladstein.[130] The email stated the following in relevant part:

> We've received some additional context from our client that there were not extensive contract negotiations with [PSG] on the "PSG Competitor" provision in Section 18.4 (Assignment) or the definition of "PSG Competitor" itself. However, as described in greater detail below, [PSG] does appear to correlate "biopharmaceutical" with pharmaceuticals derived from biological sources or large molecules and "pharmaceuticals" with small molecules and not biologics. Moreover, in the contract negotiations, the [Arranta Holdings]

---

from having looked at the annual report, it was very clear that the vast majority of their activities were not associated with biopharmaceuticals.").

[127] TT323:4–6 (Bamforth).

[128] TT323:7–324:1 (Bamforth).

[129] JTX 291 at 3.

[130] *Id.*; TT510:11–18 (Gladstein) ("Q: Did you play any role in drafting the Goodwin email that appears at the bottom of the page? A: I did not. . . . Let me qualify. We provided the information to Goodwin. I did not have any role in drafting the information—the email. The email was based on that information.").

team reports that they perceived that [PSG] did seem focused on restricting [Arranta Holdings'] ability to sell to a biopharmaceutical competitor.[131]

Notably, the evidence indicates that Gladstein did not provide Goodwin with information concerning Arranta's prior experience with AMRI or Bamforth's notes describing when Boyd offered Catalent and Lonza as examples of a PSG Competitor.[132] In determining what to disclose, Gladstein apparently viewed it important to provide information that *substantiated* Arranta's understanding of the PSG Competitor definition rather than all relevant information that may have given Recipharm more context.[133]

### 4. Merger Publicly Announced

On February 17, 2022, the day before the merger was publicly announced, Bamforth emailed Lagarde and Shafer informing them that "Arranta Bio Holdings, LLC . . . entered into an Agreement and Plan of Merger . . . with a wholly owned

---

[131] JTX 291 at 1.

[132] *Id.*; TT503:5–504:6, TT509:6–510:18. Gladstein was notably evasive on this topic at trial.

[133] JTX 521:5–23 ("Q: [G]iven your view of how clear you believe the term [PSG Competitor] is, did you believe it was necessary to provide what has been referenced here as 'public statements'? A: I believe it was helpful. Q: And was it helpful because it provided more context? A: No, because it substantiated our understanding. Q: So your goal was to provide information that substantiated your understanding. Agreed? A: Not mine personally, but the understanding of the definition of the term 'PSG Competitor.'").

subsidiary of Recipharm AB[.]"[134] The email enclosed the executed Agreement and Plan of Merger, which was dated February 17, 2022.[135]

In his email to Lagarde and Shafer, Bamforth also requested Thermo's "approval for [him] to join the Board of Recipharm."[136] Thermo's consent was required based on a restrictive covenant agreement that Bamforth entered in connection with the prior sale of Brammer Bio to Thermo.[137] Under that agreement, Bamforth was prohibited from working in a "Competing Business" for five years following the sale of Brammer Bio in 2019.[138] On March 4, the general counsel of Thermo, Claudia Harrington, informed Bamforth that Thermo would not consent to Bamforth joining the board of Recipharm. In that email, Harrington stated that Thermo had "grave concerns with [Bamforth] advising a competing business, particularly in this case, an entity that is competitive with [PSG] across so many

---

[134] JTX 296 at 1–2; TT242:8–17 (Bamforth).

[135] JTX 296 at 11; TT242:18–243:1 (Bamforth).

[136] JTX 296 at 2; TT242:8–17 (Bamforth).

[137] JTX 71.

[138] *Id.* "Competing Business" is defined in the agreement as a "Person that engages in or owns, operates, manages, controls, invests in or participates in, any business engaged in the provision of services related to developing or manufacturing gene therapy drug substances or drug products." *Id.* at 2.

relevant areas."[139] As a result, Bamforth did not join Recipharm's board of directors.[140]

At the time of the Merger, Arranta Bio Midco LLC ("Arranta Parent") owned 100% of the membership interests of Arranta.[141] Arranta Parent was wholly owned by Arranta Holdings, which had thirteen shareholders, including Thermo.[142] Arranta Holdco Inc., an indirect wholly owned subsidiary of Recipharm, acquired Arranta Holdings in a reverse triangular merger where a subsidiary of Arranta Holdco Inc., Anatolia Merger Sub, LLC, was merged into Arranta Holdings (the "Merger").[143] Arranta Holdings was the surviving company of the Merger.[144]

---

[139] JTX 323 at 2.

[140] *Id.* at 1.

[141] Dkt. 221 ("Def.'s Post-Trial OB") at 27.

[142] *Id.*

[143] *See* JTX 296 at 17–20, § 1.3.

[144] JTX 296 § 1.3.

The pre-Merger structure was as follows:



The post-Merger structure was as follows:



As described and set forth above, Arranta continued to be wholly owned by Arranta Parent, which also continued to be wholly owned by Arranta Holdings. Only the ownership of Arranta Holdings changed.

After learning the identity of the counterparty to the merger, the PSG team began considering potential options, including terminating the Supply Agreement. The PSG team focused in on the definition of PSG Competitor and sought to "think broadly" in determining whether Recipharm was a PSG Competitor.[145] Over the

[145] JTX 306 at 2 ("The immediate needs are to evaluate the investor/shareholder agreements and the 'PSG Competitor' definition in the Dedicated Supply Agreement. It will inform what are our options. . . . The Supply Agreement is with PSG . . . so we should think

course of one month following the announcement of the Merger, the PSG team began modelling various scenarios on how to pursue an exit from the Arranta relationship.[146] Around that same time, PSG and Arranta continued to represent to customers that "[t]he strategic partnership remains intact" and "[w]e have a long term agreement and don't foresee any changes to the relationship."[147]

### 5. The Merger Closes And PSG Purports To Terminate The Supply Agreement

The Merger closed on April 8, 2022.[148] As a result of the Merger, Thermo received approximately $105 million.[149] Bamforth received approximately $240 million.[150] Gladstein and Favaloro each received approximately $3 million.[151]

On April 15, 2022, Wyszkowski sent a termination letter purporting to terminate the Supply Agreement.[152] The letter was drafted by lawyers of PSG and asserted two bases for termination.[153]

---

broadly, but be mindful that the Agreement describes PSG as 'a leading large and small molecule and viral vector contract development and manufacturing organization.'").

[146] TT612:17–621:24 (Pitcher); JTX 326.

[147] JTX 349 at 3.

[148] JTX 331.

[149] JTX 296; TT144:15–16 (Bamforth).

[150] TT261:19–262:9 (Bamforth).

[151] TT502:1–19 (Gladstein); Favaloro Dep. 13:23–14:9.

[152] JTX 339.

[153] TT397:9–15 (Wyszkowski).

First, PSG stated that Recipharm was a PSG Competitor because Recipharm "derives its revenue from performing biopharmaceutical (i.e., biologics and pharmaceutical) services."[154] PSG further claimed such an interpretation "is the only meaning that gives effect to the intent of this provision" because

> PSG is defined in the Agreement as engaged in both biologics and pharmaceuticals (see first Whereas clause), PSG in fact provides CDMO services in both the biologics and pharmaceutical space (which is why this word was selected to define the competitive space), and the intent of the provision is to protect PSG in the event Arranta is acquired by a competitor of PSG.[155]

PSG asserted in the letter that the acquisition constituted a Change of Control Transaction with a PSG Competitor.[156] Pursuant to Section 18.4(b)(ii)(1) of the Supply Agreement, PSG purported to elect to deem Arranta to have issued a notice of termination under Section 16.2.2 of the Supply Agreement.[157]

Second, PSG claimed in the letter that "Arranta has faced significant and material performance issues, which are continuing under the Agreement."[158] PSG asserted that it had given Arranta formal notice of such material performance issues on January 17, 2022, when PSG sent the letter to Arranta requesting a "for cause"

---

[154] JTX 339 at 3.

[155] *Id.*

[156] *Id.* at 2.

[157] *Id.*

[158] *Id.* at 3.

audit.[159] PSG claimed that "Arranta has failed to remedy the Cause noticed on January 17, 2022, and such failure constitutes a Termination for Cause by PSG pursuant to Section 16.2.3 of the Agreement."[160]

On April 25, Arranta responded to the letter claiming that "the purported termination of the Agreement by PSG violates the unambiguous terms of the Agreement, constitutes a material breach, and amounts to a clear repudiation of the Agreement by PSG."[161] Arranta argued in the letter that "PSG improperly seeks to define 'biopharmaceutical' services as extending to both biologics and pharmaceuticals – an interpretation plainly at odds with both the language of the Agreement and the intentions of the parties."[162] On this basis, Arranta argued that Recipharm is not a PSG Competitor because "it does not derive at least 50% of its revenues from biopharmaceutical development or at least 50% of its revenues from biopharmaceutical commercial manufacturing services."[163] Arranta also disputed PSG's purported "Termination for Cause."[164]

The parties exchanged additional letters on May 2, May 12, and May 25.[165]

---

[159] *Id.*

[160] *Id.*

[161] JTX 346 at 1.

[162] *Id.*

[163] *Id.*

[164] *Id.* at 2–3.

[165] JTX 348; JTX 351; JTX 362.

## F. The Experts

PSG presented an expert to support its case-in-chief, and Arranta presented a rebuttal expert. PSG's expert, Dr. Roland Turck, is a physician with decades of experience as an executive and consultant working in a variety of companies ranging from Bayer Healthcare to a startup firm focused on oncological biologics.[166] In rendering his opinion in this case, Turck relied upon annual reports filed with the Securities and Exchange Commission ("SEC"), regulatory filings with the Food and Drug Administration, and his professional experience.[167] Turck testified that it was his expert opinion that over the past few decades, there has been increasing overlap between pharmaceutical companies and biotech companies. Per Turck, given this increasing overlap, "the word 'biopharmaceutical' is gradually replacing 'pharmaceutical' as an all-encompassing word describing the small molecule and biologics industry, companies, and elements of the value chain."[168] Turck testified that "biopharmaceutical" is usually used by sophisticated industry participants to mean both biologics and small-molecule drugs.[169] Turck stated that "biopharmaceutical" can sometimes be used to mean only biologics but, if it was

---

[166] TT524:9–531:20 (Turck).

[167] *Id.*

[168] *Id.*

[169] TT534:17–535:1 (Turck).

intended to have this narrower meaning, then that would be indicated by context (*e.g.*, putting an explanation in parentheses).[170]

Arranta's rebuttal expert, Peter Lankau, has held senior executive roles in a number of companies ranging from a specialty pharmaceutical company focused on pain management and neurology to an early-stage company that developed agents for inflammatory diseases.[171] In rebutting Turck's opinion in this case, Lankau primarily relied on dictionary definitions and reviewed the documents relied upon by Turck.[172] Lankau testified that the meaning of "biopharmaceutical" set forth in various dictionaries is that the term means biologics only, and this is consistent with how sophisticated industry participants use the word.[173] Lankau criticized Turck's reliance on filings with the SEC because, per Lankau, companies often use "biopharmaceutical" "as a branding exercise, a marketing term" as it connotes a more exciting business than "pharmaceutical."[174] Lankau acknowledged that he himself had used the term to mean both biologics and small-molecule drugs for marketing purposes.[175]

---

[170] TT536:2–19 (Turck).

[171] TT644:12–648:14 (Lankau).

[172] JTX 384; JTX 386.

[173] JTX 384; TT651:2–652:23 (Lankau).

[174] JTX 384; TT651:5–16 (Lankau).

[175] TT665:18–667:10, TT682:20–683:3, TT687:20–688:2 (Lankau).

## G.    Procedural History

PSG filed its verified complaint (the "Complaint") in this Court on July 8, 2022. The Complaint includes five counts.[176] Count I alleges that Arranta materially breached the Supply Agreement by failing to produce compliant products and that Arranta failed to cure its material breaches after receiving written notice of such breaches from PSG.[177]

Count II seeks declaratory judgment that the Merger constituted a Termination for Convenience by Arranta under Sections 16.2.2 and 18.4 of the Supply Agreement.[178]

Count III seeks specific performance (a) requiring that Arranta perform the Non-Compete Obligation and not engage in plasmid development and manufacturing services until April 14, 2025, and/or (b) permitting PSG to elect to purchase the Portable Capital Equipment at net book value after applying a $2 million credit and to ship the purchase equipment to PSG's site of choice at Arranta's sole expense.[179]

---

[176] Compl. ¶¶ 69–98.

[177] *Id.* ¶¶ 69–73.

[178] *Id.* ¶¶ 74–79.

[179] *Id.* ¶¶ 80–86.

Count IV seeks declaratory judgment that PSG was permitted to elect, and on April 14, 2022, did so elect, to declare a termination for cause.[180]

Finally, Count V seeks declaratory judgment that the termination notice PSG sent on April 14, 2022, did not anticipatorily repudiate the Supply Agreement.[181]

On July 29, 2022, Arranta filed its answer and verified counterclaims.[182] Arranta asserted six counterclaims. Count I seeks declaratory judgment that PSG did not validly terminate the Supply Agreement pursuant to Sections 16.2.2 and 18.4.[183] Count II seeks declaratory judgment that PSG did not validly terminate the Supply Agreement for cause pursuant to Section 16.2.3.[184] Count III seeks declaratory judgment that PSG repudiated and materially breached the Supply Agreement.[185] Count IV seeks an order that PSG cease misinforming third parties that Arranta is subject to any limitation regarding plasmid manufacturing.[186] In the alternative, Count IV seeks damages.[187] Count V seeks a judicial order that PSG return and delete certain confidential information that Arranta alleges was stolen by

---

[180] *Id.* ¶¶ 87–92.

[181] *Id.* ¶¶ 93–98.

[182] Dkt. 12 ("Answer and Counterclaims").

[183] Answer and Counterclaims ¶¶ 120–124.

[184] *Id.* ¶¶ 125–129.

[185] *Id.* ¶¶ 130–135.

[186] *Id.* ¶¶ 136–140.

[187] *Id.*

PSG.[188]   In the alternative, Count V seeks damages for alleged improper theft.[189]

Finally, Count VI seeks damages for PSG's alleged material breach of the Supply

Agreement.[190]

In connection with its Complaint, PSG also filed a motion to expedite and

requested that I set trial on all of PSG's claims in April 2023.[191]  In contrast, Arranta

argued that only the claims concerning the Non-Compete Obligation should be

expedited and that these claims could be resolved in one day on a largely paper

record.[192]  On August 8, 2022, I granted the motion to expedite as to the claims

concerning the Non-Compete Obligation.[193]   Based in part on Arranta's

representations concerning the narrowness of the issues for decision, I scheduled the

trial in December 2022 for two days.[194]  Arranta subsequently sought to present

equitable defenses at trial that seemed beyond the scope of the narrow and discrete

Non-Compete Obligation on which Arranta premised its request for bifurcation.[195]

---

[188] *Id.* ¶¶ 141–146.

[189] *Id.*

[190] *Id.* ¶¶ 147–154.

[191] Dkt. 1; Dkt. 22 ¶ 18.

[192] *See* Dkt. 11 at 2 ("Whether the non-compete applies is a matter of contractual interpretation.  It can be resolved by a one-day trial."); *id.* ¶ 40 ("Whether Arrant ais subject to the Non-Compete Obligation is a discrete issue of [] contract interpretation.  The Court can resolve it largely on a paper record, with minimal trial testimony.").

[193] Dkt. 35; Dkt. 37.

[194] Dkt. 35.

[195] Dkt. 139.

I permitted Arranta to address these equitable defenses at trial but allowed PSG to request additional trial time to ensure that PSG had a fair opportunity to respond.[196] PSG did not request additional time.

Trial was held on the expedited claims, counterclaims, and defenses on December 15 and 16, 2022. Post-trial argument was held on February 10, 2023.

## II. ANALYSIS

The fundamental dispute before this Court is whether PSG had the right to deem the Merger a Termination for Convenience by Arranta. The parties tangle over the preconditions to trigger a Termination for Convenience by Arranta. PSG's right to deem the Merger a Termination for Convenience by Arranta is partly conditional on the counterparty to the Merger being a PSG Competitor. I begin my analysis by addressing the meaning of "PSG Competitor." The analysis proceeds in this manner since the primary focus of the two-day trial and much of the parties' briefing was on whether Recipharm was a PSG Competitor.

As explained below, I conclude that "biopharmaceutical" is unambiguous and encompasses large-molecule biologics only. The term "biopharmaceutical" does not include small-molecule pharmaceuticals. Thus, a PSG Competitor is a "third Party whose business derives at least fifty percent (50%) of its revenues from performing

---

[196] Dkt. 116.

contract [biologics] development or commercial manufacturing services."  It is undisputed that Recipharm did not derive at least 50% of its revenues from biologic CDMO services.  Therefore, Recipharm is not a PSG Competitor, and PSG had no right to trigger a Termination for Convenience by Arranta.

Based on this, Counts II and III of PSG's Complaint must be dismissed and judgment must be entered for Arranta on Count I of its counterclaims.

## A.    Meaning Of The Term "PSG Competitor"

PSG Competitor is defined in the Supply Agreement as "a Third Party whose business derives at least fifty percent (50%) of its revenues from performing contract biopharmaceutical development or commercial manufacturing services."[197]  The crux of the parties' dispute is whether "biopharmaceutical" means only large-molecule biologics or means both large-molecule biologics and small-molecule drugs.[198]

---

[197] Supply Agreement § 1.106.

[198] PSG has argued at certain points that the term "PSG Competitor" is itself ambiguous. *See, e.g.,* Dkt. 182 ("Pl.'s Pretrial Br.") at 33–34.  However, PSG did not meaningfully develop this point and instead focused its argument on the meaning of "biopharmaceutical."  Thus, I do not address it except to note that, even if PSG had meaningfully developed this argument, I would likely not find it compelling because PSG Competitor is a defined term within the Supply Agreement and therefore has an explicitly given meaning.  "[A]mbiguity exists only '[w]hen words of an agreement are . . . subject to different interpretations and when the words . . . otherwise create ambiguity when viewed in light of other contractual provisions[.]'" *Sassano v. CIBC World Mkts. Corp.*, 948 A.2d 453, 468 n.86 (Del. Ch. 2008) (quoting *Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, 1997 WL 525873, *4 (Del. Ch. Aug. 13, 1997)).  The term PSG Competitor is defined, and I look to the definition given to PSG Competitor by

44

"Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning."[199] The "contract's construction should be that which would be understood by an objective, reasonable third party."[200] "Absent some ambiguity, Delaware courts will not destroy or twist [contract] language under the guise of construing it."[201] "Contract language is not ambiguous merely because the parties dispute what it means. To be ambiguous, a disputed contract term must be fairly or reasonably susceptible to more than one meaning."[202]

"Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract."[203] "When a term's definition is not altered or has 'no 'gloss' in the [relevant] industry it should be construed in accordance with its ordinary dictionary

---

the parties in the Supply Agreement to determine whether that definition is subject to different interpretations. For the reasons set out herein, I conclude that it is not.

[199] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012).

[200] *Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014) (internal citation omitted).

[201] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992).

[202] *Alta Berkeley*, 41 A.3d at 385 (footnote omitted).

[203] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006). *Accord In re Solera Ins. Coverage Appeals*, 240 A.3d 1121, 1132 n.67 (Del. 2020) ("Delaware case law is settled that undefined words are given their plain meaning based upon the definition provided by a dictionary.") (quoting *Del. DNREC v. McGinnis Auto & Mobile Home Salvage, LLC*, 225 A.3d 1251, 1260–61 (Del. 2020) (Valihura, J., dissenting)).

meaning."[204] "In addition to relying on dictionary definitions, a court may look to how a term or phrase is used in a particular legal context. Put another way, '[u]nless a different intention is manifested' in the contract, 'where language has a generally prevailing meaning, it is interpreted in accordance with that meaning,' and 'technical terms and words of art are given their technical meaning when used in a transaction within their technical field.'"[205]

I conclude that "biopharmaceutical" is unambiguous and encompasses only large-molecule biologics. Even if I were to find that "biopharmaceutical" is ambiguous, much of the extrinsic evidence put forth at trial would ultimately not be relevant to my analysis. And even the limited amount that would be is either neutral or tends to support the conclusion that "biopharmaceutical" includes only large-molecule biologics, not small-molecule drugs. Thus, PSG has failed to establish by a preponderance of the evidence that Recipharm was a PSG Competitor because Recipharm did not derive more than 50% of its revenue from "biopharmaceutical" CDMO services.

I pause to highlight that this case arguably exemplifies why our courts have long held that extrinsic evidence may not be used to create ambiguity or to vary the

---

[204] *Lorillard Tobacco*, 903 A.2d at 740 (quoting *USA Cable v. World Wrestling Fed'n Entm't, Inc.*, 766 A.2d 462, 474 (Del. 2000)).

[205] *In re P3 Health Gp. Hldgs., LLC*, 282 A.3d 1054, 1067 (Del. Ch. 2022) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 202(3) (Am. L. Inst. 1981)).

meaning of an unambiguous term. After sitting through the two-day trial and devoting *considerable* time and attention to the parties' briefing, transcripts, and exhibits, I can quite confidently say that none of the negotiators gave much thought to the definition of PSG Competitor or, more particularly, the meaning of "biopharmaceutical" when they negotiated the Supply Agreement. This is entirely understandable because the numerous dictionary definitions and expert testimony establish that "biopharmaceutical" is unambiguous. But where one party tries to resist this conclusion and search for ambiguity, it is unsurprising to be confronted with a record like the one here—tea leaf facts and cherrypicked communications that simply do not support the weight placed upon them. Even so, the Court must interpret contracts "as written and not as hoped for by litigation-driven arguments."[206] Accordingly, and despite PSG's efforts, the only reasonable interpretation of "biopharmaceutical" is that it is an unambiguous term encompassing only drugs derived from biologics.

### 1. "Biopharmaceutical" Is Unambiguous

The clear and unambiguous meaning of "biopharmaceutical"—as established by every dictionary definition presented in this matter—is a drug derived from biologics. Despite failing to introduce a single contrary dictionary definition, PSG tries to avoid this conclusion and create ambiguity through expert testimony and

---

[206] *Urdan v. WR Cap. P'rs, LLC*, 244 A.3d 668, 675 (Del. 2020).

reliance on caselaw that is distinguishable from the present dispute. As set forth below, PSG's efforts fail.

### a. Numerous Dictionaries Establish That "Biopharmaceutical" Is Unambiguous

Arranta argues that, under its plain meaning, "biopharmaceutical" refers only to large-molecule biologics derived from living organisms and does not include small-molecule drugs.[207] In support of this argument, Arranta points to multiple dictionary definitions of the term "biopharmaceutical." While each of these dictionaries define "biopharmaceutical" in a slightly different manner, every single dictionary provides that such term connotes a drug either derived from biological sources or living organisms or otherwise consisting of large, complex molecules like proteins:

- *Merriam Webster*: "a pharmaceutical derived from biological sources and especially one produced by biotechnology."[208]

- *American Heritage Dictionary*: "[a] drug produced by means of biotechnology, consisting of a large, complex molecule such as a protein rather than a small molecule."[209]

---

[207] Def.'s Post-Trial OB at 43–48.

[208] *Biopharmaceutical*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/biopharmaceutical (last visited Apr. 4, 2023).

[209] *Biopharmaceutical*, AM. HERITAGE DICTIONARY, https://www.ahdictionary.com/word/search.html?q=biopharmaceutical (last visited Apr. 4, 2023).

- *Oxford English Dictionary*: "[a] pharmaceutical agent, typically a protein or peptide, produced by biotechnology."[210]

- *Cambridge Dictionary*: "medicine and drugs that are produced using biotechnology (= the use of living things, especially cells and bacteria, in industrial processes)."[211]

- *Dictionary of Pharmaceutical Medicine*: "[t]herapeutic product involving biotechnology, e.g. genetic engineering; product of biotechnological origin such as antisense, genetic engineering, transgenics, involving manipulation of living organisms."[212]

Furthermore, all dictionaries referenced by Arranta define "biopharmaceutical" to mean a pharmaceutical or drug that is produced by or involving biotechnology.[213] The definition of "biotechnology" from these same dictionaries further supports the meaning of "biopharmaceutical" as a drug derived from living organisms.[214]

---

[210] *Biopharmaceutical*, OXFORD ENG. DICTIONARY, https://www.oed.com/view/Entry/ 261445? (last visited Apr. 4, 2023).

[211] *Biopharmaceutical*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/ biopharmaceuticals?q=biopharmaceutical (last visited Apr. 4, 2023).

[212] *Biopharmaceutical*, DICTIONARY OF PHARM. MED., https://link.springer.com/chapter/10.1007/978-3-211-89836-9_127 (last visited Apr. 4, 2023).

[213] *See id.*

[214] *See, e.g.*, *Biotechnology*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/biotechnology (last visited Apr. 4, 2023) ("the manipulation (as through genetic engineering) of living organisms or their components to produce useful usually commercial products (such as pest resistant crops, new bacterial strains, or novel pharmaceuticals)"); *Biotechnology*, AM. HERITAGE DICTIONARY, https://www.ahdictionary.com/word/search.html?q=biotechnology (last visited Apr. 4, 2023) ("The use of living organisms or biological processes for the purpose of developing useful agricultural, industrial, or medical products, especially by means of techniques, such as genetic engineering, that involve the modification of genes"); *Biotechnology*, OXFORD ENG. DICTIONARY, https://www.oed.com/view/Entry/19255 (last visited Apr. 4, 2023)

### b. The Expert Testimony Does Not Establish That "Biopharmaceutical" Is Ambiguous

PSG did not offer any contrary dictionary definitions in support of its interpretation of "biopharmaceutical" as encompassing both large-molecule biologics and small-molecule pharmaceuticals. Rather, PSG argues that "biopharmaceutical has an industry meaning not portrayed in dictionaries."[215] To

___

("the application of science and technology to the utilization and improvement of living organisms for industrial and agricultural production and (in later use) other biomedical applications"); *Biotechnology*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/biotechnology (last visited Apr. 4, 2023) ("the use of living things, especially cells and bacteria, in industrial processes"); *Biotechnology*, DICTIONARY OF PHARM. MED., https://link.springer.com/chapter/10.1007/978-3-211-89836-9_129 (last visited Apr. 4, 2023) ("Development of products by a biological process. Production may be carried out by using intact organisms, such as yeasts and bacteria, or by using natural substances (e.g. enzymes) from organisms; techniques involving manipulation of living organisms or substances made by living organisms, particularly at the molecular genetic level; according to the U.S. Office of Science and Technology Policy, the term covers also 'recently developed and newly emerging genetic manipulation techniques, such as recombinant DNA (rDNA), recombinant RNA (rRNA), and cell fusion, that are sometimes referred to as genetic engineering'").

[215] Pl.'s Post-Trial AB at 8; *see also* Turck Dep. 125:9–125:16 ("Q: As part of your research, did you review any dictionaries? A: I think we talked about that before. I did note the definition in the dictionaries but, as I mentioned before, believe that dictionaries tend to lag behind the—the common usage of words, not only in this case but in other cases."). In its pretrial brief, PSG cited to a portion of the *Lorillard* opinion in support of the proposition that this Court may reject dictionary definitions. It dropped this argument in its post-trial briefing. Pl.'s Pretrial Br. at 37. I highlight this point because the portion of *Lorillard* cited to by PSG does not stand for the proposition for which PSG asserts it does in its pre-trial briefing. Rather, in that section of *Lorillard*, our Supreme Court simply discussed how the Court of Chancery expressly declined to consider dictionary definitions. *Lorillard*, 903 A.2d at 736. The Supreme Court later held in that opinion that "the Vice Chancellor's abandonment of all dictionaries . . . [was] not supported by precedent." *Id.* at 738.

that end, PSG contends that I must look to extrinsic evidence in the form of its expert's testimony to find a meaning of "biopharmaceutical" that contradicts the numerous dictionary definitions.[216]

PSG's argument seems to be that the expert testimony in this matter constitutes a special form of extrinsic evidence that is not subject to the well-settled rule (discussed below) that extrinsic evidence may not be used to manufacture ambiguity. PSG's position would seem to invite mischief in commercial litigation. If I were to adopt its approach, then I risk "creating an ambiguity where none exists" and imposing rights and obligations on parties to which they did not agree.[217] "By such judicial action, the reliability of written contracts is undermined, thus diminishing the wealth-creating potential of voluntary agreements."[218] In any event, I need not resolve this question because I find that PSG's expert has failed to demonstrate why anything other than the apparently unanimous dictionary definition of biopharmaceutical should apply in the context of the Supply Agreement.

---

[216] Pl.'s Post-Trial AB at 3–15. I note that, while the numerous dictionaries that Arranta presented include a technical dictionary that defines "biopharmaceutical" consistent with the understanding that it references only biologics, PSG failed to identify even a single technical dictionary definition in support of its position.

[217] *Allied Cap. Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006) (citation omitted).

[218] *Id.* (citation omitted).

Turck, PSG's expert, testified that sophisticated industry participants do not use dictionaries to determine the meaning of technical words like "biopharmaceutical" when negotiating contracts.[219] Turck highlighted that "[biopharmaceutical] is a relatively recent term that has been used more frequently in the last maybe ten, fifteen years."[220] Per Turck, given that it is a relatively recent term, one must look to how sophisticated industry participants use "biopharmaceutical" since these participants, not dictionaries, are responsible for shaping its meaning.[221] Turck testified that sophisticated industry participants may use "biopharmaceutical" to mean just large-molecule biologics in some circumstances or to mean both biologics and small-molecule drugs in other circumstances.[222]

---

[219] TT550:19–552:9 (Turck). Turck testified that his "default assumption" is that "biopharmaceutical" is used to mean both large-molecule biologics and small-molecule drugs but sometimes may be used to mean only large-molecule biologics if indicated by the context. TT536:2–8 (Turck). Per Turck, "the context can be indicated by putting an explanation in parentheses after biopharmaceutical, for instance, or it can be a pairing, so that you would pair 'biopharmaceuticals' with another word, or then you would have, in the same paragraph, an indication that the narrower sense is intended . . . that the general assumption, the default assumption, doesn't apply." TT536:12–19 (Turck).

[220] TT536:20–537:1 (Turck). *See also* TT:537:2–17 (Turck) (stating in response to a question about why the term "biopharmaceutical" has emerged to mean both biologics and small molecules that "[i]t's a term that became necessary because the portfolio of companies changed" because "over time, large pharma acquired biotech companies or they acquired the capabilities to develop biologics, and their portfolio became a mixed portfolio between small molecules and biologics").

[221] TT552:10–557:14 (Turck).

[222] *Id.*

While Turck stated that he reviewed regulatory filings and industry association publications, Turck pointed primarily to 10-K filings from 2020 and 2021 for a variety of drug manufacturers during his testimony.[223] Of the eleven 10-K filings Turck reviewed, only two of those filings were from CDMOs.[224] Notably, those two CDMOs were Lonza and Catalent. As counsel for Arranta highlighted during Turck's cross-examination, both Lonza and Catalent distinguish their revenue between biologics and small molecules.[225] In addition, Turck acknowledged that 10-K filings from other drug manufacturers at times distinguish between pharmaceuticals and biologics.[226]

---

[223] TT537:18–538:2; 552:10–557:14 (Turck). At trial, Turck focused primarily on 10-K filings by certain drug manufacturers, including "Pfizer, AbbVie, Merck, BMS, Biogen, a few others." TT539:4–540:8 (Turck). Per Turck, these large drug manufacturers "shape how words have been used" in the pharmaceutical industry. TT540:9–16 (Turck). Turck highlighted that these drug manufacturers use "biopharmaceutical" in their 10-K filings "as an all-encompassing term, including small molecules as well as biologics, reflecting their mixed portfolio." TT541:3–8 (Turck).

[224] TT570:2–8 (Turck) ("Q: You cited to two CDMOs in your report as indicative of how CDMOs use the term in the industry? A: Yes, as I said, I focused on the drug manufacturers. And if I remember correctly, I also focused very much on this – on Lonza and Catalent during the last few years.").

[225] TT572:16–573:1 (Turck) ("Q: And so the two CDMOs that you relied on classify their revenue between biologics and small molecules. Right? A: Right. And as we've seen before, Lonza characterizes or includes small molecules in their definition of biopharmaceutical. Q: When they use the term 'biopharmaceuticals,' but not when they split out their revenue between biologics. Correct? A: Right.").

[226] *See, e.g.*, TT581:20–582:12 (Turck) ("THE COURT: Dr. Turck, can you turn back to . . . the Catalent 10-K. . . . The first line under revenue. It says, 'we sell products and services directly to our pharmaceutical, biopharmaceutical, and consumer health customers.' How do you interpret the use of 'pharmaceutical' and 'biopharmaceutical' there? THE WITNESS: That could be redundant. It could be also in the narrow sense. I

Arranta's rebuttal expert, Lankau, testified that the industry operates in two segments: "the biologic segment that constitutes large-molecule products used for very distinct diseases" and "the larger pharmaceutical or small-molecule market, where products are typically developed and commercialized for large patient populations."[227]   Per Lankau, there are very substantial differences between biologics and small-molecule pharmaceuticals in how these products are manufactured, the patient populations they serve, how they are regulated, and how they are marketed.

For example, the manufacturing process for biologics is substantially different from the process for small-molecule drugs.  Lankau testified that small-molecule drugs are derived from chemical synthesis and are milled, granulated, and dried to create, for example, an oral medication.[228]  Manufacturers of small-molecule drugs use agitators, blenders, and tablet presses to create the drugs.[229]  In contrast, biologics start with a cell line, which may be derived from bacteria or mammalian cells that, once adjusted, and are placed into a fermenter to enhance their growth potential to

mean, that would be kind of the pairing.  In general, Catalent distinguishes between, if I remember correctly, between biopharmaceuticals versus over-the-counter medicines.").

[227] TT654:17–655:4 (Lankau).

[228] TT655:5–17 (Lankau).

[229] TT655:18–656:5 (Lankau).

increase the volume of cells.[230]  Ultimately, these cells go through an extraction process to separate out the active ingredient from the cell mass itself.[231]

In addition, pharmaceuticals are typically used to treat diseases and conditions like diabetes and hypertension that involve large patient populations and are marketed to a wide variety of physicians.[232]  In contrast, biologics are typically used to treat diseases that involve smaller patient populations (*e.g.*, certain cancers and autoimmune diseases) and are marketed primarily to specialists associated with such conditions.[233]  Based on this testimony, Lankau stated that the dictionary definitions offered by Arranta are consistent with industry usage.[234]

Lankau was critical of Turck's reliance on 10-K filings.  Lankau testified that a company that primarily derives its revenue from small-molecule drugs might describe itself as a "biopharmaceutical company" to convey a positive image to its

---

[230] TT656:9–18 (Lankau).

[231] TT656:19–22 (Lankau).  Indeed, the *raison d'être* for the Supply Agreement itself, the Watertown Facility, this dispute and the matter to be tried in September is the distinct character of—and great difficultly associated with—commercial manufacturing of biologics.  Having considered the evidence in this matter, the numerous distinctions between biologic and small-molecule manufacturing are clearly something that sophisticated industry participants—like the parties here—would readily know and appreciate.

[232] TT658:5–659:6 (Lankau).

[233] TT659:7–660:8 (Lankau).

[234] TT653:15–654:14 (Lankau).

investors, which are the audience for 10-K filings.[235] The term "biopharmaceutical" "suggests that the company is involved in innovation, in new technology, whether it's for small molecules or not."[236] Lankau testified that the "branding" that one might see in a 10-K must be distinguished from how these companies describe themselves when negotiating agreements, where companies are far more precise.[237] Lankau testified that "when companies are sitting down across the table from each other looking to negotiate an agreement, they're very precise in the language they use" and "will look at phrases like 'biopharmaceutical' as being very explicit to their [meaning as] a drug derived from living organisms."[238]

During his direct testimony and on cross-examination, Lankau acknowledged that "biopharmaceutical" may be used by industry participants to encompass both large-molecule biologics and small-molecule pharmaceuticals in certain contexts.[239] Indeed, Lankau acknowledged that he himself has used "biopharmaceutical" to

---

[235] TT663:16–664:10 (Lankau).

[236] TT664:11–18 (Lankau).

[237] TT66419:665:17 (Lankau).

[238] TT665:10–17 (Lankau).

[239] *See, e.g.*, TT682:20–683:3 (Lankau) ("Q: And I apologize for doing this, and I'm going to continue to do it. Your use of the term 'biopharmaceutical' [in Lankau's own website] includes both small molecule and biologics; isn't that right? A: As it relates to pharma and biotech services, that's correct. Q: So that's yes? A: That's a yes."); TT687:20–688:2 (Lankau) ("Q: So in your testimony earlier, when you—when you affirmatively stated that the term 'biopharmaceutical' means biologics in all uses of the term, that was incorrect? A: That would have been incorrect as it relates to the use of the term within the industry, as opposed to a marketing context.").

encompass biologics and small-molecule pharmaceuticals in his own CV, website, and to describe the company where he previously served as CEO.[240] While PSG made significant hay over Lankau's use of "biopharmaceutical" in this manner, I find this fact wholly consistent with his expert testimony. That some participants in the industry may use a term broadly for marketing purposes—here, to foster the notion in the market that a business is dynamic and cutting edge—does not change the fact that "biopharmaceutical" has an unambiguous meaning in a non-marketing contractual context.[241] That unambiguous meaning is consistent with all dictionary definitions entered in this case.

### c. The Caselaw Cited By PSG Is Distinguishable

Furthermore, the two cases on which PSG relies in arguing that I ignore dictionary definitions are distinguishable from this dispute. PSG cites to *Pharmaceutical Product Development, Inc. v. TVM Life Science Ventures VI, L.P.* for the proposition that this Court may look to extrinsic evidence to find ambiguity.[242] PSG also cites to this Court's opinion in *In re P3 Health Group*

---

[240] TT665:18–667:10, 680:19–689:8 (Lankau); JTX 385 at 1; JTX 402 at 1; JTX 403 at 1.

[241] *See* TT664:11–18 (Lankau) (stating that a company that is primarily involved in the small-molecule drug industry may nonetheless market itself as a "biopharmaceutical" company because "it suggests that the company is involved in innovation, in new technology, whether it's for small molecules or not.").

[242] Pl.'s Post-Trial OB at 46–47; Pl.'s Post-Trial AB at 9–10.

*Holdings, LLC* for the proposition that dictionary definitions "are not the only source of plain meaning."

In *Pharmaceutical Product Development, Inc.*, the parties disputed the meaning of the word "efficacy" in the context of a drug compound used to treat psoriasis.[243] The defendants argued that "efficacy" meant only a drug's ability to achieve a desired therapeutic or physiological response.[244] The plaintiff argued that a drug's potency (*i.e.*, "the relative amount of drug needed to produce a given response") is related to its efficacy.[245] In rejecting the defendants' narrow construction at the pleadings stage, this Court highlighted that while some dictionaries defined "efficacy" in the more narrow sense advocated by the defendants, other pharmacology textbooks broadly considered potency alongside efficacy.[246] Based on these competing sources, this Court concluded that it was reasonably conceivable that a drug compound's potency was related to its efficacy.[247]

---

[243] 2011 WL 549163, at *2 (Del. Ch. Feb. 16, 2011).

[244] *Id.*

[245] *Id.* (quoting Gary C. Rosenfeld & David S. Loose, PHARMACOLOGY 5 (4th ed. Lippincott Williams & Wilkins 2007)).

[246] *Id.* at *3–4.

[247] *Id.* at *2, 6.

In *In re P3 Health*, this Court addressed whether it had personal jurisdiction over the general counsel of a Delaware limited liability company.[248] To resolve the dispute over personal jurisdiction at the pleadings stage, this Court had to determine the meaning of "material participation," as that term is used in the Delaware LLC Act.[249] The Court first looked to dictionaries to determine the meaning of "material participation."[250] The Court also noted that the concept of "material participation" had a long history in federal tax law and looked to that history in determining the meaning of "material participation."[251] Notably, while this Court did look to other non-dictionary sources in determining the meaning of "material participation," its review of federal tax law sources was not used to contradict the dictionaries used but to reinforce its analysis of dictionary definitions.[252]

Both cases are distinguishable from this dispute. In *Pharmaceutical Product Development, Inc.*, this Court weighed dictionaries and pharmacology textbooks in determining whether it was reasonably conceivable that "efficacy" was ambiguous. In contrast, PSG has not cited a single dictionary or textbook that defines "biopharmaceutical" as including both biologics and small-molecule drugs.

---

[248] 282 A.3d 1054, 1058 (Del. Ch. 2022).

[249] *Id.* at 1065.

[250] *Id.* at 1065–66.

[251] *Id.* at 1067–69.

[252] *Id.* at 1068.

Concerning *In re P3 Health*, PSG asks that I look to extrinsic evidence to contradict the numerous dictionary definitions that run contrary to its asserted meaning of "biopharmaceutical." This is inconsistent with the approach taken in that case, where this Court used extrinsic evidence to reinforce its interpretation of dictionary definitions.

Finally, PSG asks that I find ambiguity in the Supply Agreement by looking to the recitals, which describe PSG as "a leading large and small molecule and viral vector [CDMO]."[253] This argument fails. To begin, "recitals are not substantive provisions of an agreement."[254] PSG is correct that recitals can "be used to explain some apparent doubt with respect to the intended meaning of the" Supply Agreement.[255] However, there is no apparent doubt as to the unambiguous meaning of "biopharmaceutical." Furthermore, the recital PSG points to does not even use the term "biopharmaceutical."

### d. "Biopharmaceutical" Unambiguously Means Biologics Only

In light of these considerations, I conclude that the meaning of "biopharmaceutical" is unambiguous in the context of the parties' negotiations. To

---

[253] Supply Agreement, Recitals.

[254] *Urdan v. WR Cap. P'rs, LLC*, 2019 WL 3891720, at *13 (Del. Ch. Aug. 19, 2019), *aff'd*, 244 A.3d 668 (Del. 2020).

[255] *Id.* (quoting *New Castle Cty. v. Crescenzo*, 1985 WL 21130, at *3 (Del. Ch. Feb. 11, 1985)).

begin, numerous dictionaries define "biopharmaceutical" as a drug derived from living organisms, which is consistent with meaning biologics only. While there are instances where deviation from dictionary definitions is appropriate, it is notable that PSG was unable to point to a *single* dictionary that supported its interpretation of "biopharmaceutical." Furthermore, even if it was appropriate to look to Turck's testimony and the 10-Ks he discussed, this extrinsic evidence was rebutted by Lankau. In any event, Turck's expert testimony is insufficient to overcome the mountain of authoritative sources that define "biopharmaceutical" as encompassing biologics only.

I conclude that the unambiguous meaning of "biopharmaceutical" is biologics only. Therefore, PSG Competitor means a "third party whose business derives at least 50% of its revenues from performing [*biologics*] development or commercial manufacturing services." Because it is undisputed that Recipharm did not derive at least 50% of its revenue from biologics, Recipharm is not a PSG Competitor.

### 2. Though Irrelevant Given The Lack Of Ambiguity, Extrinsic Evidence From The Negotiation Of The Supply Agreement Is Consistent With Arranta's Interpretation

Where the "contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity."[256] Thus, as I have already concluded that "biopharmaceutical" is

---

[256] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).

unambiguous, it would be appropriate to conclude my analysis here and go no further. Because most of the trial focused on extrinsic evidence relating to the meaning of "biopharmaceutical," however, I nonetheless briefly address the limited relevant extrinsic evidence presented at trial to confirm that its consideration would not change the outcome here.

If I were to consider extrinsic evidence, "[s]uch extrinsic evidence [could] include overt statements and acts of the parties, the business context, prior dealings between the parties, [and] business custom and usage in the industry."[257] With that said, "relevant extrinsic evidence is that which reveals the parties' intent *at the time they entered into the contract*" and "backward-looking evidence gathered after the time of contract is usually not helpful."[258]

The parties presented two categories of extrinsic evidence in support of their competing interpretations of the term PSG Competitor: (1) communications between or among the parties at the time of drafting the Supply Agreement; and (2) subsequent conduct of the parties after executing the Supply Agreement. Having considered the parties' testimony, the only sufficiently reliable evidence from the time the parties negotiated the Supply Agreement are Boyd's comment that Catalent

---

[257] *In re Mobilactive Media, LLC*, 2013 WL 297950, at *15 (Del. Ch. Jan. 25, 2013) (quoting *United Rentals, Inc. v. RAM Hldgs, Inc.*, 937 A.2d 810, 834–35 (Del. Ch. 2007)).

[258] *Eagle Indus., Inc.*, 702 A.2d at 1233 n.11 (citation omitted) (emphasis in original).

and Lonza were examples of PSG Competitors and a handful of internal Arranta notes and emails.[259] I conclude that, even if I could consider this extrinsic evidence, this sparse evidence is either neutral or consistent with Arranta's interpretation. The remaining evidence presented at trial concerned communications and events arising after the parties negotiated and signed the Supply Agreement. I conclude that such evidence, even if I could consider it, would ultimately be irrelevant to my analysis.

### a. Communications During Supply Agreement Negotiations Either Support Or Are Consistent With Arranta's Interpretation

The primary piece of extrinsic evidence from the parties' negotiation of the Supply Agreement is Boyd's statement that PSG did not want Arranta selling itself to a company like Lonza or Catalent. At the time Boyd made this statement, Lonza derived more than 50% of its revenue from biologic CDMO services.[260] In contrast,

---

[259] The record in this matter also includes vague testimony about what is, at this point, perhaps best described as the witnesses' recollections of the "atmospherics" of the negotiations. In the heat of this litigation, I do not find this sort of testimony particularly reliable or helpful. Instead, my sense is that such testimony is, perhaps unintentionally, informed by the litigation and the outsize importance these matters now have. In any event, I find that the parties did not actually express the views about "biopharmaceutical" that they now suggest could have been gleaned from the overall context of the discussions. *See United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 835 (Del. Ch. 2007) ("[T]he private, subjective feelings of the negotiators are irrelevant and unhelpful to the Court's consideration of a contract's meaning, because the meaning of a properly formed contract must be shared or common.") (cleaned up). Indeed, the lack of such discussions is consistent with the understanding that "biopharmaceutical" was, and is, unambiguous.

[260] JTX 249 at 108; JTX 233 at 92. For purposes of this Memorandum Opinion, "revenue from biologics" encompasses Lonza's revenues from both the "Biologics" and "Cell & Gene" segments identified in Lonza's business segment reporting within its annual reports.

Catalent derived 29% of its revenue from biologics in June 2019 and 33% of its revenue from biologics in June 2020.[261] Boyd, PSG's lead negotiator, testified that he understood PSG Competitor to mean "anyone that derives 50 percent of their revenue as a CDMO" and used Catalent and Lonza as examples to convey this understanding.[262]

At first blush, this evidence could support interpreting "biopharmaceutical" as meaning both biologics and small-molecule drugs since Catalent derived less than 50% of its revenue from biologic CDMO services. However, this initial impression

---

[261] JTX 080 at 53; JTX 213 at 50. For purposes of this Memorandum Opinion, "revenue from biologics" encompasses Catalent's revenues from the "Biologics and Specialty Drug Delivery" segment identified in Catalent's business segment reporting within its annual reports.

[262] TT27:16–28:1 (Boyd). I note that PSG makes much of the fact in its briefing that Boyd is no longer employed with PSG. Pl.'s AB at 16 (stating that Boyd "stand[s] to gain nothing from the outcome of this litigation" because he "now works for Catalent, a prime competitor of [PSG]"). Boyd, however, was the key negotiator for PSG and is still a high-level employee in the industry. TT7:8–16 (Boyd) (testifying that he is currently the vice president of finance for cell, gene, and protein therapies at Catalent). PSG's suggestion that Boyd does not care about the outcome of this dispute is unreasonable, if for reputational purposes alone. This may explain why Boyd's testimony came across as stilted at trial. In any event, based on Boyd's and Bamforth's testimony at trial, it does not appear that anyone at either PSG or Arranta actually assessed the exact percentage of revenue each of Catalent and Lonza derived from biologics. Instead, it appears that all parties relied on their general industry knowledge. *See* TT58:20–59:4 (Boyd) ("Q: So – and you testified, I believe, that you thought Catalent had roughly 25 percent of its revenue derived from biologics? A: Correct. Q: That's from your memory; right? A: That is. Q: You didn't do an analysis to show what that number is; correct? A: I did not."); TT155:23–156:2 (Bamforth) ("Q: Did you look at Lonza's revenues to confirm that it met the definition of 'PSG Competitor' when Mr. Boyd raised it during the negotiations? A: I did not."); TT157:6–10 (Bamforth) ("Q: When Mr. Boyd raised Catalent as an example of a potential PSG Competitor, did you look at Catalent's revenues to confirm whether or not it met the definition? A: No.").

fades under scrutiny. Around the time the parties negotiated the Supply Agreement, Catalent was aggressively growing its biologics business.[263] Indeed, as of June 30, 2022—just two years after signing—Catalent derived more than 50% of its revenue from biologics.[264] Both Boyd and Bamforth knew of Catalent's aggressive expansion in biologics and that it could be a potential acquiror of Arranta during the nine-year term of the Supply Agreement.[265]

To the extent Boyd was trying to convey his subjective belief that "biopharmaceutical" meant both small-molecule drugs and biologics, Catalent was an odd example to use given the general awareness of Bamforth and Boyd as to its aggressive acquisition strategy.[266] This is particularly the case considering the nine-

---

[263] Catalent stated in its 2020 10-K that "[i]n large part due to our recent acquisitions and their subsequent organic growth, revenue contributions from our biologics business have grown from approximately 10% in fiscal 2014 to 33% in fiscal 2020." JTX 213 at 7. That 10-K further states that "[w]e believe our own internal innovation, supplemented by current and future external partnerships and acquisitions, will continue to strengthen and extend our leadership positions in the delivery and development of drugs, biologics, cell and gene therapies, and consumer health products." *Id.*

[264] JTX 378 at 7.

[265] *See* TT59:22–66:13 (Boyd) (PSG's lead negotiator acknowledging his awareness at the time the Supply Agreement was negotiated that Catalent had spent billions of dollars since 2017 to acquire biologics businesses and expand into the biologics market); TT156:11–157:5 (Bamforth) (Arranta's lead negotiator stating that, while he was not aware of Catalent's percentage of revenue from biologics during negotiations, he was aware that Catalent was very active in the biologics CDMO sector and had prior conversations with Catalent's CEO, who described the company's intention to expand rapidly in the biologics area).

[266] Instead, one would expect Boyd to have used an example of a CDMO that had no or very little biopharmaceutical activity (like Recipharm)—or to have simply and straightforwardly said *any CDMO*.

year term of the Supply Agreement—practically speaking, and considering the business context of the negotiations, it was not as relevant who was a PSG Competitor at the time of signing but who might be a PSG Competitor in the near-to intermediate-future when a sale transaction might more reasonably be expected to occur.[267] Lonza already derived over 50% of its revenue from biologics. Catalent was trending in that direction, and, within two years from the date of the Supply Agreement—indeed, at approximately the time of the Merger—it derived over 50% of its revenue from biologics.

In addition to these examples, PSG points to two other pieces of extrinsic evidence from the time of negotiation to support its asserted meaning of "biopharmaceutical." First, in contemporaneous notes from April 2020 that refer to Section 18.4, Bamforth wrote, "Cannot have sale to Competitor (CDMO)."[268] Second, on May 12, 2020, Favaloro sent an email to certain Arranta investors where he wrote that "the basis of the push on assignability [ ] is to ensure the protection of [PSG] clients in the instance a Catalent or Lonza were to acquire the business."[269] In a subsequent email to these same investors on May 26, 2020, Bamforth stated that

---

[267] For example, Lagarde testified at his deposition that he understood that Bamforth's business model was to develop new ventures with private equity seed money with the goal of selling the company a few years later to monetize the private equity investors' investment. Lagarde Dep. 104:2–11.

[268] JTX 399 at 70.

[269] JTX 153.

PSG "wanted the right to block a sale to a Competitor," and wrote that "Competitor" meant ">50% CDMO business."[270]

I ultimately conclude that these notes and emails support neither Arranta nor PSG. Favaloro's email on May 12, 2020, is consistent with the conclusion that Boyd told Arranta's negotiators that Catalent and Lonza were examples of PSG Competitors but never explained that those examples stood in for "any CDMO." Concerning Bamforth's handwritten notes and email, Bamforth testified that he was using shorthand.[271] This seems entirely reasonable. Having observed Bamforth's testimony, I am in no way surprised that he did not take the time to write a short note or email with the lawyerly precision that PSG suggests is now fatal to Arranta's case. These tea leaf facts are ultimately too thin a reed to support the weight that PSG requires them to bear.

Thus, though extrinsic evidence is ultimately irrelevant to my analysis since "biopharmaceutical" is unambiguous, the communications from the time of negotiation either tend to support or at least are consistent with the conclusion that "biopharmaceutical" means drugs derived from biologics only.

---

[270] JTX 161.

[271] TT163:20–164:21 (Bamforth).

### b.  The Remaining Extrinsic Evidence Is Irrelevant

The parties focused much of the trial on three other categories of extrinsic evidence: evidence surrounding the potential acquisition of the Watertown Facility by AMRI, evidence surrounding the Merger, and other agreements involving PSG and third parties. As already noted, extrinsic evidence unrelated to the time of contract is generally not relevant in determining the parties' intended meaning of an ambiguous term.[272] This is doubly the case considering "biopharmaceutical" is not ambiguous. Therefore, I expressly do not address this remaining extrinsic evidence considering it is irrelevant to my analysis.

### B.  Additional Arguments Not Addressed In This Memorandum Opinion

Arranta argues that PSG's claims fail for additional reasons. First, Arranta argues that Section 18.4 requires that Arranta assign the Supply Agreement before PSG's right to deem a Termination for Convenience is triggered.[273] Second, Arranta argues that a reverse triangular merger involving its grandparent, Arranta Holdings, did not constitute a Change of Control Transaction.[274] Per Arranta, this is because a condition to any Change of Control Transaction under the Supply Agreement is that

---

[272] *See, e.g.*, *supra* Section II.A.2.

[273] Def.'s Post-Trial OB at 33–36; Def.'s Post-Trial AB at 5–10.

[274] Def.'s Post-Trial OB at 36–42; Def.'s Post-Trial AB at 10–13.

Arranta be a party to the applicable transaction.[275]  Third, Arranta argues that the "counterparty" to Arranta Holdings' in the Merger was Arranta Holdco Inc. (*not* Recipharm) because it was the "Buyer" of Arranta Holdings.[276]  Per Arranta, because Arranta Holdco Inc. did not derive any revenue from CDMO services, it would not be a PSG Competitor.[277]  Finally, Arranta raised certain equitable defenses.

Because I have concluded that Recipharm is not a PSG Competitor, which is a condition to PSG's right to trigger a Termination for Convenience by Arranta, I need not reach these other arguments.  It is quite notable, however, that with respect to which entity was the counterparty to the Merger, PSG's arguments resort to assertions that I apply the step-transactions doctrine and ignore corporate formalities.  PSG's reliance on these theories suggests further problems in its position concerning Section 18.4.

In summary, "biopharmaceutical" unambiguously means drugs derived from living organisms (*i.e.*, biologics) and does not include small-molecule pharmaceuticals.  Thus, a PSG Competitor is a "Third Party whose business derives

---

[275] Def.'s Post-Trial OB at 36–42; Def.'s Post-Trial AB at 10–13.

[276] Def.'s Post-Trial OB at 42–43; Def.'s Post-Trial AB at 13–14.  *See also* JTX 296 at 17 ("This Agreement and Plan of Merger . . . is by and among Arranta Holdco Inc., a Delaware corporation ("Buyer") . . . Recipharm AB (publ), a corporation incorporated under the laws of Sweden ("Recipharm"), solely with respect to Section 10.19 of this Agreement . . . [and] Arranta Bio Holdings, LLC, a Delaware limited liability company (the "Company")[.]").

[277] Def.'s OB at 43; Def.'s Post-Trial AB at 14.

at least fifty percent (50%) of its revenues from performing contract [biologics] development or commercial manufacturing services." It is undisputed that Recipharm did not derive at least 50% of its revenues from biologic CDMO services. Therefore, PSG had no right to deem the Merger a Termination for Convenience by Arranta.

## III. CONCLUSION

For the foregoing reasons, Counts II and III of PSG's Complaint must be dismissed, and Arranta is entitled to judgment in its favor on Count I of its counterclaims. The parties are directed to confer and submit a proposed form of order within three business days.